**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

CENTER FOR THE HUMAN RIGHTS
OF CHILDREN; AMERICAN
IMMIGRATION COUNCIL

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY

U.S. CUSTOMS AND BORDER
PROTECTION

*Defendants*.

Civil Action No. 20-cv-6449

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking to compel the U.S. Department of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP") to immediately release records relating to the unprecedented use of a process for restricting immigration along the Canadian and Mexican borders under the purported authority of a public health law, 42 U.S.C. § 265. This new process, hereinafter referred to as "Title 42 Expulsion," was established through a new regulation, administrative order, and an operational memo. Title 42 Expulsion has led to the immediate expulsion of unaccompanied children (officially designated as "unaccompanied alien children" by statute), among others, who are apprehended by CBP, as well as the detention of children in hotels prior to expulsion. Title 42 Expulsion has occurred out of the public eye and with little to no information regarding the whereabouts or treatment of children apprehended by CBP. Furthermore, there has been no public explanation for whether, and if so—how, Title 42 Expulsion impacts the rights of children under the Trafficking Victims Protection Reauthorization Act ("TVPRA") 8 U.S.C. § 1232.

2.      An "unaccompanied alien child" is any child who has no lawful immigration status in the United States, has not attained 18 years of age, and has no parent or legal guardian in the United States or for whom no parent or legal guardian in the United States is available to provide care and physical custody. *See* 6 U.S.C. § 279(g).  These children are entitled to certain statutory protections upon apprehension by law enforcement, such as the transfer of custody to the Secretary of Health and Human Services no later than 72 hours after determination that they meet the definition of an "unaccompanied alien child." *See* 8 U.S.C. § 1232(b)(3). Additionally, an "unaccompanied alien child" sought to be removed by DHS must be placed in removal proceedings under 8 U.S.C. § 1229a, where they appear before immigration judges, have access to certain due process protections such as access to counsel, appointment of a child advocate, and inclusion in a safe repatriation program and the ability to apply for relief from deportation.  *See* 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5), (c)(6), and (a)(5)(A).

3.      Notwithstanding these clear statutory protections, in March, 2020, Defendants began to summarily expel undocumented migrants, including UAC, pursuant to an Interim Final Rule issued by the Centers for Infectious Disease Control ("CDC"), hereinafter "March 2020 Expulsion Order." Specifically, the CDC ordered the "immediate suspension" of the "introduction of persons or property" from certain countries where the presence of an infectious disease is "a serious danger of the introduction of such disease into the United States." *See* 85 Fed. Reg. 17,060 (Mar. 26, 2020).

4.      While the CDC purportedly implemented Title 42 Expulsion in response to the spread of the novel coronavirus, the public later learned  that the current Administration "…directed the nation's top disease control agency to use its emergency powers to effectively seal the U.S. borders, overruling the agency's scientists who said there was no evidence the action

would slow the coronavirus…"[1] In the ensuing weeks, many public health officials, doctors, and infectious disease experts urged that Title 42 Expulsion would not help control the spread of the virus in any meaningful way.[2] At the same time, legal practitioners and immigration law experts have warned that Title 42 Expulsion unlawfully overrides statutory and legal obligations to undocumented individuals who are apprehended at the border.[3]

5.    Despite those statutory obligations to the contrary, Defendants have reportedly carried out an unprecedented number of summary expulsions of individuals apprehended and subjected to the procedures under Title 42 Expulsion. According to media reports, over 150,000 individuals have been expelled since March.[4] Defendants have repatriated almost 9,000 UAC to unknown conditions without any regard for their safety or well-being.[5] However, it is unclear how many of those unaccompanied children were expelled under Title 42 Expulsion, and how many had been deported after being afforded the procedural safeguards under existing immigration law.[6]

6.    Further complicating matters, an unknown number of children who have been subjected to Title 42 Expulsion have also been detained in undisclosed hotels prior to their

---

[1] *See* Jason Dearen and Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae.
[2] *See* Global Health, *Letter to HHS Secretary Azar and CDC Director Redfield By Leaders of Public Health Schools, Hospitals and Other U.S. Institutions* (May 19, 2020), https://www.publichealth.columbia.edu/public-health-now/news/public-health-experts-urge-us-officials-withdraw-order-enabling-mass-expulsion-asylum-seekers (last accessed Oct. 29, 2020).
[3] *See* Lucas Guttentag, *Coronavirus Border Expulsions: CDC's Assault on Asylum Seekers and Unaccompanied Minors*, Just Security (Apr. 13, 2020), https://www.justsecurity.org/69640/coronavirus-border-expulsions-cdcs-assault-on-asylum-seekers-and-unaccompanied-minors/.
[4] Camilo Montoya-Galvez, *Nearly 9,000 Migrant Children Have Been Expelled Under Pandemic Border Policy, Court Documents Say*, CBS News (Sept. 11, 2020), https://www.cbsnews.com/news/8800-migrant-children-have-been-expelled-under-pandemic-border-policy-per-court-documents/.
[5] *Id*.
[6] *See* Flores Independent Monitor Interim Report on the Use of Temporary Housing for Minors and Families Under Title 42 at 6-8, *Flores v. Barr*, 2:85-cv-04544-DMG, ECF No. 938 (C.D. Cal. Aug. 26, 2020) (detailing the number of total expulsions under Title 42 and removals under Title 8, but only listing the number of "encounters" of unaccompanied children by CBP since March, 2020) [hereinafter Flores Monitor Report].

expulsion.[7] Those guarding the children for up to weeks at a time had no known child welfare training and it is unclear whether protections afforded to detained individuals under the Prison Rape Elimination Act apply to these circumstances.[8] While this practice has been reported by the media and is currently enjoined pending review in the Ninth Circuit[9], federal immigration agencies have not been forthcoming about what child protection measures have been made available to these children.[10] The federal immigration agencies have detained children as young as ten in hotels, yet little remains known about how or why the immigration agencies select those children for unlawful detention in undisclosed hotels.

7. The expedient implementation of Title 42 Expulsion obviates the rule of law, divesting vulnerable UAC of codified protections. Defendants are violating robust statutory provisions enacted by Congress to protect this extremely vulnerable population. Neither DHS nor CBP has released information regarding the continued justifications and implementation of Title 42 Expulsion to this population. Except for opaque data released pursuant to ongoing litigation,[11] Defendants have not publicly addressed how many unaccompanied children have been expelled under Title 42, how CBP officers are being trained to make determinations before subjecting an unaccompanied child to Title 42 Expulsion, how contracting parties are being trained to care for the children detained in hotels, how protections such as the Prison Rape Elimination Act are or are not being implemented in *ad hoc* prison settings such as a hotel, or what effect an unaccompanied child's negative test for COVID-19 has in terms of amenability to Title 42 Expulsion.

---

[7] *See* Caitlin Dickerson, *A Private Security Company Is Detaining Migrant Children at Hotels*, N.Y. Times (Aug. 16, 2020), https://www.nytimes.com/2020/08/16/us/migrant-children-hotels-coronavirus.html.
[8] *Id.*
[9] *See Flores v. Barr*, 2:85-cv-4544-DMG, ECF No. 976 (C.D. Ca1. 2020 Sept. 4, 2020).
[10] *See* Flores Monitor Report, *supra* note 6, at 17.
[11] *See* Flores Monitor Report *supra* note 6.

8.      In response to the lack of publicly disclosed information, Plaintiffs Center for the Human Rights of Children ("CHRC") and the American Immigration Council ("Council"), as well as the Illinois Chapter, American Academy of Pediatrics, submitted a FOIA Request ("Plaintiffs' Request") to CBP on August 20, 2020, seeking records related to the application of the CDC Order to unaccompanied children apprehended by CBP. Plaintiffs' Request specifically seeks information that relates to CBP officers' apprehension of UAC, quarantine measures taken by CBP during apprehension, compliance with other obligations under the TVPRA[12] for the care and custody of UAC facing Title 42 Expulsion, the significance of a child's negative COVID-19 results for purposes of Title 42 Expulsion, data regarding the number of children who have been expelled specifically under Title 42, and information relating to detention of UAC in non-disclosed hotels.

9.      Despite the public's urgent need to understand the impact of Title 42 Expulsion on UAC due to the many legal ramifications, Defendants have failed to provide a response within the statutory timeframe mandated by law. As a result, the full scope of Defendants' actions with regard to the continued implementation of Title 42 Expulsion as to UAC remains unknown to the public.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1331.

11.      This Court has jurisdiction to grant declaratory and further proper relief pursuant to 5 U.S.C. §552(a)(4)(B), 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

12.      Venue lies in this District under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e) because Plaintiff CHRC resides in this district.

---

[12] *See* 8 U.S.C. § 1232 *et seq.*

5

**PARTIES**

13.     Plaintiff Center for the Human Rights of Children, Loyola University School of Law ("CHRC") is a not-for-profit educational organization. Established in 2007, CHRC pursues an agenda of interdisciplinary research, outreach, education, and advocacy to address critical and complex children's rights issues.  As a component of the Civitas ChildLaw Center at Loyola University Chicago School of Law, CHRC works in collaboration with faculty, students, and community stakeholders to advance the human rights of children.  Child migration and exploitation is one of CHRC's core outreach and research areas.  CHRC promotes its research and advocacy through its network of academic professional, community stakeholders, and concerned members of the public in order to create more child-centric programs, policies, and initiatives.

14.     Plaintiff American Immigration Council ("the Council"), a not-for-profit organization established to increase public understanding of immigration law and policy, advocates for the fair and just administration of U.S. immigration laws, protects the legal rights of noncitizens and citizens, and educates the public about the enduring contributions of immigrants. Through research and analysis, the Council has become a leading resource for policymakers at the national, state, and local levels who seek to understand the power and potential of immigration and to develop policies that are based on facts rather than myths. The Council also seeks to hold the government accountable for unlawful conduct, restrictive interpretations of the law, and for failing to ensure that the immigration laws are implemented and executed in a manner that comports with due process through the pursuit of transparency and impact litigation.

15.     Defendant DHS is an agency of the United States government and an agency within the meaning of 5 U.S.C. § 552(f). DHS is responsible for administering and enforcing immigration laws. DHS is comprised of multiple component agencies, including CBP. In the past year, DHS

has been responsible for overseeing CBP in the detention and expulsion of individuals under Title 42 Expulsion.

16.     Defendant CBP is a component agency of DHS and an agency within the meaning of 5 U.S.C. § 552(f). CBP is a law enforcement agency whose mission is to "safeguard America's borders." [13]  In the past year, CBP officers have been tasked with the principal job of determining whether an individual is amenable to Title 42 Expulsion upon apprehension.[14]

## STATEMENT OF FACTS

### Existing Statutory Protections for Unaccompanied Alien Children Prior to Title 42

17.     Congress has authorized the care and custody of UAC who are apprehended at the border by immigration agencies to the Secretary of Health and Human Services. 8 U.S.C. § 1232(b)(1). Additionally, UAC, as well as all undocumented individuals who are apprehended on United States soil, who express an intention to apply for asylum must be referred to an asylum officer for interview prior to being removed.  8 U.S.C. § 1225(b)(1)(A).

18.     If CBP apprehends an unaccompanied child, the agency must determine within 48 hours of apprehension whether the child is, in fact, an "unaccompanied alien child." 8 U.S.C. § 1232(a)(4).  If a minor is found to meet the definition, then DHS must transfer custody of the child to the Secretary of Health and Human Services ("DHHS") within seventy-two hours of making that determination. 8 U.S.C. § 1232(b)(3).

19.     Upon transfer of custody to DHHS, UAC are placed in the care and custody of the Office of Refugee Resettlement ("ORR") whose mission it is to actively pursue reunification of

---

[13] U.S. Customs & Border Prot., *About CBP*, https://www.cbp.gov/about.
[14] *See* Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately — Ignoring Asylum Law*, ProPublica (April 2, 2020) https://www.propublica.org/article/leaked-border-patrol-memo-tells-agents-to-send-migrants-back-immediately-ignoring-asylum-law (linking to leaked memo, referencing "Operation Capio" (hereinafter "Operation Capio Memo"), https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html).

the child with their parent, guardian, suitable relative, or a licensed care provider during the pendency of the child's immigration proceedings. All placements must be made pursuant to the best interests of the child. 8 U.S.C. § 1232(c)(2)

20.     By law, all UAC are required to be placed in removal proceedings before an immigration judge. 8 U.S.C. § 1229(a). Further, all UAC must be given access to an attorney and a child advocate to represent them at their court hearings. *See* 8 U.S.C. § 1232(a)(5)(D).

21.     Additionally, under a long-standing settlement, the *Flores* Settlement Agreement, UAC in the federal government's custody are entitled to minimum standards of guaranteed care.[15] Certain minimum standards include placement in the least restrictive setting, with a preference for reunification with a parent or qualifying family member or guardian, as expeditiously as possible.[16] Additionally, UAC cannot be detained with an unrelated adult for more than twenty-four hours.[17]

**March 2020 Expulsion Order and Title 42 Expulsion**

22.     On January 20, 2020, the United States reported its first confirmed case of the novel coronavirus, COVID-19 in Washington State. By March 26, 2020, the United States had become the world leader in COVID-19 infections, with at least 81,321 confirmed cases and more than 1,000 deaths due to COVID-19 infection.[18]

23.     On March 20, 2020, the CDC issued a new regulation without notice or comment in response to the pandemic. *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or

---

[15] Stipulated Settlement Agreement, *Flores v. Meese*, 2:85-cv-4544, (C.D. Cal. 1997) (Jan. 17, 1997), https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement0117 97.pdf.
[16] *Id*. at ¶ 14.
[17] *Id*. at ¶ 12.A.
[18] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. Times (Aug. 6, 2020), https://www.nytimes.com/article/coronavirus-timeline.html.

Places for Public Health Purposes. 85 Fed. Reg. 16559-01 (Mar. 24, 2020). The CDC introduced this new regulation under the purported authority of the Public Health Service Act of 1944. *See* 42 U.S.C. §265. In promulgating the rule, the CDC authorized the prohibition of introduction of "those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the [CDC] Director determines to present a risk of transmission of a communicable disease." 85 Fed. Reg. at 16,563.

24.     Under the new regulation, the CDC issued a thirty-day "Order Under Sections 362 and 365 of the Public Health Services Act [42 U.S.C. §§265, 268] Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists." 85 Fed. Reg. 17,060-17,088 (Mar. 26, 2020) ("March 20 Expulsion Order"). The March 20 Expulsion Order directed the immediate "suspension of introduction" of "covered aliens." 85 Fed. Reg. at 17,067. "Covered aliens" refers to those individuals who seek to enter the United States via Canadian or Mexican ports of entry, those individuals "who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States between [ports of entry]." 85 Fed. Reg. at 17,061.

25.     The March 2020 Expulsion Order cited the risk of COVID-19 transmission in "congregate settings" at land ports of entry and CBP stations as the main justification for subjecting "covered aliens" to summary expulsion. *Id.* However, the CDC offered no explanation as to the "manner the [CDC] Director determines [an alien] to present a risk of transmission of a communicable disease." *Id*. Indeed, the CDC Director declined to issue this guidance – instead it came at the insistence of the Vice President in coordination with the Acting Director of DHS, Chad Wolf.[19]

---

[19] *See* Dearen and Burke, *supra* note 1.

26. The March 2020 Expulsion Order also instructs CBP to develop "…an operational plan for implementing the order" and that officers could, in their discretion, determine that certain "covered aliens" should be excepted from Title 42 Expulsion based on the "totality of the circumstances." 85 Fed. Reg. at 17,067.

27. The March 2020 Expulsion Order provided no explanation regarding its application to UAC, nor how existing statutory protections for UAC would be treated under Title 42.

28. The March 20 Expulsion Order was extended for an additional 30 days on April 20, 2020. *See* Extension of Order Under Sections 362 and 365 of the Public Health Services Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020).

29. On May 20, 2020, the March 2020 Expulsion Order was extended indefinitely. *See* Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020).

30. On September 11, 2020, the CDC issued an Interim Final Rule which partially amended the March 2020 Expulsion Order and provided for only a thirty-day window for public comment. *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (September 11, 2020). Significantly, one of the amended provisions stated that "suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States." *Id.; see also* 42 C.F.R. § 71.40(b)(5).

31. On October 13, 2020, despite the CDC's previous May 20, 2020 Order which indefinitely extended the March 2020 Expulsion Order, the CDC again extended the Expulsion

Order but with subsequent opportunities for review every thirty days. *See* Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists. 85 Fed. Reg. 65,806 (Oct. 16, 2020). Alarmingly, the newest CDC extension mentions in a footnote only that "suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States." 85 Fed. Reg. 65,806 (citing 42 C.F.R. § 71.40(b)(5)).

32. Pursuant to a leaked memo, CBP officers have been tasked with the principal duty of determining whether an individual presents a "serious danger of the introduction" of COVID-19 into the United States and whether that individual is amenable to Title 42 Expulsion.[20] According to the memo, CBP officers are to rely on their "training and experience" when making these determinations.[21]

33. The memo also states that when determining whether a person presents a serious danger of introducing COVID-19, and is therefore amenable to Title 42 Expulsion, officers are to rely on the following considerations: "physical observation, use of sensors and technology, physical indicators and tracking techniques, information from third-parties, and deductive techniques."[22]

34. Despite the purported public health justification for the March 2020 Expulsion Order, the leaked memo is silent on whether a CBP officer's failure to detect any observable indication of COVID-19 infection in an individual should or will factor into the determination of their amenability to Title 42 Expulsion. Rather, the memo permits expulsion merely where the

---

[20] *See* Lind, *supra* note 14, "Operation Capio Memo" at 1.
[21] *Id.*
[22] *Id.*

officer "believes that it is more likely than not that a person is an alien seeking to enter the United States, without proper travel documentation or otherwise subject to travel restrictions at or between a [port of entry]...."[23]

***The Role of DHS and CBP in the Treatment of Unaccompanied Alien Children in the Title 42 Process***

35.     Congress established DHS under the Homeland Security Act of 2002. 6 U.S.C. § 101.

36.     CBP is a component agency of DHS whose mission is to "safeguard America's borders" and is tasked with securing the United States' border at and between ports of entry, securing and facilitating imports arriving in the United States, and securing and facilitating legitimate travel for United States citizens and international travelers.[24]

***CBP's Role in the Apprehension of Unaccompanied Alien Children***

37.     If CBP officers determine that an alien who is arriving in the United States or is inadmissible, the officer "shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum." 8 U.S.C. §1225(b)(1)(A)(i). CBP officers are required to refer those who express a fear or an intent to apply for asylum to a USCIS asylum officer for a credible fear interview. *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(2)(i), (b)(4).

38.     Pursuant to Congress' decision to remove the care of children from DHS and place them in the care of HHS, CBP officers historically have had a limited role in the care and custody of UAC.

---

[23] *Id.*
[24] *About CBP*, *supra* note 13.

39.     CBP and its officers and agents have a long and well-documented history of misconduct towards children, whether unaccompanied or accompanied by their parents.[25] Additionally independent government commissions, non-governmental organizations, and the media have documented CBP officers' routine failure to fulfill even the limited statutory and regulatory responsibilities they have in facilitating individuals' attempts to seek asylum, and have even interfered with or discouraged those attempts.[26]

40.     Journalists, researchers, faith-based organizations, and non-governmental organizations have reported that CBP officers have a high incidence of physical and verbal abuse towards  individuals in their custody.[27] For example, journalists have documented the "poor

---

[25] *See* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-20-35, *CBP Separated More Asylum-Seeking Families at Ports of Entry Than Reported and for Reasons Other Than Those Outlined in Public Statements*, (May 29, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf; Clara Long, *Kids in Cages: Inhumane Treatment at the Border*, Human Rights Watch (July 11, 2019), https://www.hrw.org/news/2019/07/11/written-testimony-kids-cages-inhumane-treatment-border#; Lizzy O'Leary, *'Children Were Dirty, They Were Scared, and They Were Hungry,'* The Atlantic (June 25, 2019), https://www.theatlantic.com/family/archive/2019/06/child-detention-centers-immigration-attorney-interview/592540/.

[26] *See, e.g.*, John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, The Intercept (Aug. 11, 2019, 12:20 PM), https://bit.ly/2Kx6Zir; Human Rights First, *Fact Sheet: Allowing CBP to Conduct Credible Fear Interviews Undermines Safeguards to Protect Refugees* (Apr. 2019), https://bit.ly/2nwR5vF; Amnesty International, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers* (2017), https://bit.ly/2s12uoD; Guillermo Cantor & Walter Ewing, American Immigration Council, *Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered* (Aug. 2017), https://bit.ly/2huoQtO; U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://bit.ly/2uydMQ8.

[27] *See, e.g.* Vanessa Romo, *U.S. Border Agents Seen on Video Trying to Deport a Man Who 'Looks Mexican'*, NPR (Apr. 12, 2018), https://n.pr/2mH1HrD; Univ. of Chi. Law School Int'l Human Rights Clinic, et al., *Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection*, 10-15 (May 2018), https://bit.ly/2oe2b8W; Cantor & Ewing, *supra* note 26, at *13-16*; Jesuit Conf. of Canada & U.S., *Our Values on the Line: Migrant Abuse and Family Separation at the Border*, 6-10 (Sept. 2015), http://bit.ly/2oYdkuT; ACLU of Arizona, *Record of Abuse: Lawlessness and Impunity in Border Patrol's Interior Enforcement Operations*, 6 (Oct. 2015), http://bit.ly/2od9EVZ; The Ctr. for Latin American Studies, Univ. of Ariz., *In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security*, 24 (Mar. 2013), http://bit.ly/2oca0Mp; Daniel E. Martínez, et al., American Immigration Council, *Bordering on Criminal: The Routine Abuse of Migrants in the Removal System*, 6 (Dec. 2013), http://bit.ly/2nAvtyv.

conditions that are not pure byproducts of overcrowding," for detained children, the sexual assault of a child in CBP custody by a CBP officer, and CBP retaliation against other children for protesting the conditions of their confinement.[28]

41.     CBP officers are now principally charged with making the determination of whether or not to expel an apprehended child under Title 42 Expulsion.[29]  They are directed to make this determination based on their purported experience and training.  However, neither DHS nor CBP have issued any public guidance or criteria governing how CBP officers will assess which UAC are "amenable" to Title 42 Expulsion. Notwithstanding the *de minimus* guidance to officers, subjecting any child to Title 42 Expulsion violates Congress' mandate that these vulnerable children be placed in removal proceedings.[30]

### DHS's Role in the Detention and Expulsion of Unaccompanied Alien Children

42.     When a child who is apprehended at the border and in the custody of CBP and is determined to be an "unaccompanied alien child" consistent with Congressional intent, DHS is obligated to transfer custody of that child to DHHS within seventy-two hours. However, when UAC are processed pursuant to the March 20 Expulsion Order, they are often held beyond seventy-two hours; in some cases, they are held for weeks.[31]

43.     Federal immigration agencies sometimes hold UAC subject to Title 42 Expulsion in hotels.  Reports on DHS's practice of detaining minors in hotels have indicated that the children do not always know where they are held, nor do their parents. Additionally legal aid providers face

---

[28]Jacob Soboroff & Julia Ainsley, *Migrant kids in overcrowded Arizona border station allege sex assault, retaliation from U.S. agents*, NBC News (July 9, 2019, 8:30 PM), https://nbcnews.to/2LbfbGP; Simon Romero, Zolan Kanno-Young, Manny Fernandez, Daniel Borunda, Aaron Montes and Caitlin Dickerson, *Hungry, Scared and Sick: Inside the Migrant Detention Center in Clint, Tex.*, N.Y. Times (July 9, 2019), https://nyti.ms/2L7dREA.
[29] *See* Lind, *supra* note 14, "Operation Capio Memo" at 1.
[30] 8 U.S.C. § 1232(a)(5)(D).
[31] *See* Flores Monitor Report, *supra* note 6, at 12-14.

difficulty establishing lines of communication with the detained children.[32] So far, media reports have documented DHS's use of hotels in cities such as McAllen, Texas, El Paso, Texas, Phoenix, Miami, San Diego, Los Angeles, and Seattle have been.[33]

44. Public reports also note that DHS has contracted private security firm employees to guard children in hotels.[34] This has created instances where a lone, minor child has been held in a hotel room with an unknown adult, whose qualifications, licensing, or professional training in child care are unknown, at best.[35]

45. On September 4, 2020, the Southern District of California enjoined DHS' practice of using hotels to detain children, finding that the practice violates the *Flores* Settlement Agreement.[36]

***Plaintiffs' FOIA Request and Defendants' Response***

46. In order to shed light on CBP's role in the implementation of Title 42 Expulsion, the Center for the Human Rights of Children, American Immigration Council, (together, "Plaintiffs") and the Illinois Chapter, American Academy of Pediatrics submitted a FOIA Request ("Plaintiffs' Request") to CBP on August 20, 2020. *See* Exhibit A.

47. The Plaintiffs' Request sought records regarding CBP's actions under Title 42 Expulsion that either have been implemented since March 20, 2020 or are currently planned and that relate to the detention and expulsion of UAC under Title 42, including records describing, referring, or relating to:

---

[32] *See Flores v. Barr*, *supra* note 9 at 15-16.
[33] *See* Dickerson, *supra* note 6.
[34] *Id.*
[35] *Id*.
[36] *See Flores v. Barr*, *supra* note 9 at 17.

a. A copy of the final interagency memo or directive received by CBP from the CDC regarding the CDC directive to prohibit introduction of certain persons into the United States who, due to the existence of COVID-19 in countries or place through which persons are traveling, create a serious danger of such introduction of the disease into the United States.

b. A copy of the final internal memo or directive from CBP to field offices or sector chiefs regarding existing and planned quarantine measures taken by CBP at field offices and processing sites prior to March 20, 2020.

c. A current list of quarantine measures implemented at CBP field offices and processing sites under guidance from the CDC.

d. A copy of the "Pandemic Integrated Logistics Support Plan" (ILSP) approved by the DHS Chief Readiness Support Officer (CRSO) on June 15, 2004, and implemented by CBP, and copies of all subsequently updated or revised versions of the ILSP implemented by CBP.

e. A copy of the final internal memo or directive from CBP to field offices or sector chiefs explaining how the Title 42 Process will be applied to unaccompanied alien children encountered at the border.

f. A copy of the final internal memo or directive from CBP to field offices and sector chiefs explaining the criteria for determining whether a person creates a serious danger of the introduction of COVID-19.

g. A current list of child protection protocols followed by CBP officers for ensuring the safety, welfare, and integrity of unaccompanied alien children when they are encountered by CBP and subsequently detained at non-official CBP sites, including

but not limited to hotels, motels, and temporary housing facilities, pending expulsion determination.

h. A copy of the final internal memo or directive from CBP to field offices and sector chiefs explaining the effect of an unaccompanied alien child's negative COVID-19 test on his or her eligibility for expulsion under Title 42.

i. Copies of memos, directives, emails, or any written correspondence between the DHS Office of the General Counsel, and the CBP Office of the Chief Counsel referencing the statutory obligations under the TVPRA concerning the requirement that unaccompanied alien children be placed in removal proceedings and the Title 42 Process.

j. A copy of the final memo or directive from the DHS Office of General Counsel to the CBP Office of the Chief Counsel regarding how the Title 42 Process is to be implemented within the interior of the United States and the applicability of the order to unaccompanied alien children already placed in removal proceedings.

k. Data on the total number of unaccompanied alien children who have not been admitted due to expulsion under the Title 42 Process, for fiscal year 2020, from March to the present.

l. Data on the total number of unaccompanied alien children who had been placed into removal proceedings and who were subsequently subject to expulsion under the Title 42 Process, for fiscal year 202, from March to the present.

Exhibit A at 1-3.

48. The Plaintiffs' Request further sought a waiver of fees. *See* Exhibit A at 3-5.

49. On August 20, 2020, shortly after submitting the Request, Plaintiffs received an e-mail delivery confirmation receipt from CBP. *See* Exhibit B.

50. In a letter dated August 21, 2020, CBP acknowledged receipt of the Request. *See* Exhibit C. In that letter, CBP stated that while its "goal is to respond within 20 business days of receipt of [Plaintiffs'] Request, FOIA does permit a 10-day extension of this time period in certain circumstances." *Id.* Defendant CBP then invoked the ten-day extension "since [Plaintiffs'] request seeks a voluminous amount of separate and distinct records." *Id.* The notice also assigned tracking number CBP-2029-074326 to the Plaintiffs' Request. *Id.*

51. Also, on August 21, 2020, Plaintiffs received a separate email notice of Plaintiffs' Request fee waiver disposition, which stated that the "fee waiver...has been determined to be not applicable as the request is not billable." *See* Exhibit D.

52. On August 25, 2020, Plaintiffs received an email notice that Plaintiffs' Request had been transferred from the CBP FOIA Division to the DHS Privacy Office – FOIA Division. *See* Exhibit E. The notice stated that "the [CBP] FOIA Division is unable to assist you with your request. The Department of Homeland Security's Privacy Office-FOIA Division is a single point of contact for individuals who have inquiries or seek information pertaining to the Coronavirus (COVID-19). Your request has been forwarded to the DHS Privacy Office." *Id.*

53. In a letter dated August 27, 2020, DHS acknowledged receipt of the transferred Request. *See* Exhibit F. In that letter, DHS stated that while its "goal is to respond within 20 business days of receipt of [the] [R]equest, FOIA does permit a 10-day extension of this time period in certain circumstances." *Id.* at 3. Defendant DHS then invoked the ten-day extension "as [Plaintiffs'] request seeks documents that will require a thorough and wide-ranging search." *Id.* The letter also assigned reference number 2020-HQFO-01736 to the Plaintiffs' Request. *Id.* at 4.

Additionally, the letter stated that "DHS has determined that it will conditionally grant your request for a fee waiver." *Id.* at 3.

54.    Defendants have failed to provide any substantive response to Plaintiffs' Request within the statutory timeframe. To the contrary, after initial receipt notices and communications regarding FOIA tracking numbers and transfer to DHS, none of the Defendants have communicated further with Plaintiffs or produced any information in response to the Plaintiffs' Request.

55.    Defendants have custody and control over the records Plaintiffs seek to make publicly available under 5 U.S.C. § 552(a)(2). Because Defendants have failed to respond to the Plaintiffs' Request within the applicable statutory period, any administrative remedies are deemed exhausted. 5 U.S.C. § 552(a)(6)(C)(i).

56.    Plaintiffs have been irreparably harmed by Defendants' failure to timely respond to their Request.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Conduct an Adequate Search for Responsive Records

57.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs.

58.    Defendants are obligated under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Plaintiffs' FOIA Requests.

59.    Defendants failed to conduct such a search with respect to Plaintiffs' FOIA Request.

60.     Defendants' failure to conduct a reasonable search for records responsive to Plaintiffs' Requests violates 5 U.S.C. § 552(a)(3).

## SECOND CAUSE OF ACTION
### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Make a Timely Determination and Promptly Produce Responsive Documents

61.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs.

62.     Defendants are obligated under 5 U.S.C. § 552(a)(6)(A)(i) and (B)(i) to make a determination on Plaintiffs' FOIA Request within thirty business days.

63.     Defendants did not make a determination within thirty business days of receipt of the Plaintiffs' Request.

64.     Defendants are obligated to produce responsive records promptly under 5 U.S.C. § 552(a)(3)(A)(i).

65.     Defendants DHS and CBP failed to promptly produce responsive records.

66.     Defendants' failure to make a determination within the statutory time frame and produce responsive records promptly violates 5 U.S.C. § 552(a)(3)(A)(i), (a)(6)(A)(i) and (B)(i).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, and that the Court:

a.     Order Defendants DHS and CBP to conduct a search for records responsive to the Plaintiffs' Request under 5 U.S.C. § 552(a)(3);

b.     Order Defendants DHS and CBP to make a timely determination and promptly produce records responsive to  Plaintiffs' Request as required by 5 U.S.C. § 552(a)(3)(A); (a)(6)(A)(i) and (a)(6)(B)(i);

     c.        Enjoin Defendants from improperly withholding records;

     d.        Declare that Defendants' failure to conduct an adequate search violates 5 U.S.C. § 552(a)(3);

     e.        Declare that Defendants' failure to promptly produce records responsive to Plaintiffs' Requests violates 5 U.S.C. § 552(a)(3)(A), (a)(6)(A)(i) and (a)(6)(B)(i);

     f.        Award Plaintiffs reasonable attorneys' fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E) and any other applicable statute or regulation; and

     g.        Grant such other relief as the Court may deem just, equitable, and appropriate.

Respectfully submitted,

Dated: October 29, 2020

*/s/Claudia Valenzuela*

Claudia Valenzuela
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
(202) 507-7540
cvalenzuela@immcouncil.org